## Case No. 12,473.

### In re SCHOENENBERGER.

[15 N. B. R. 305.] [1]

District Court, S. D. Ohio. Feb. 19, 1877.

BANKRUPTCY — PREFERENCE — LIMIT OF TIME IN MAKING—KNOWLEDGE OF INSOLVENCY— SURRENDER OF PREFERENCE.

1. The limitation within which a preference may be set aside is four months in voluntary and two months in involuntary cases.

2. A party who receives a preference with knowledge of his debtor's insolvency and that a fraud on the act is intended, can prove but a moiety of his debt in either class of cases.

3. But where he voluntarily restores to the assignee the preference which he has received, and there is no actual but only a constructive fraud, he will be allowed to share pro rata with the other creditors.

By FLAMEN BALL, Register:

On the 26th of June, 1876, Joseph M. Schoenenberger filed two proofs of claims against the estate of his father, the bankrupt. One claiming the sum of eight thousand eight hundred and sixty-four dollars, for a balance due on a promissory note for nine thousand five hundred dollars given as alleged for money loaned by him to the bankrupt, and the other claiming the sum of six hundred and seventy-eight dollars and forty-three cents, for the amount due on a promissory note of the bankrupt, given for premiums on life insurance in the Union Central Life Insurance Company, and by it assigned to the said Joseph M. Schoenenberger. On the 9th of November, 1876, the assignee filed his petition for the re-examination of both of said claims on the following grounds, as to the claim for eight thousand eight hundred and sixty-four dollars, namely: First, that no such sum of money was loaned to the bankrupt; second,

<hr>

1 [Reprinted by permission.]

that as assignee of Weil & Co., the said Joseph M. Schoenenberger received assets of great value, which he has not accounted for to the bankrupt; third, that on the 1st of April, 1876, the said Joseph M. Schoenenberger knowingly received of his father a preference in money of two thousand and twenty-five dollars with a view to prevent the same from being distributed under the bankrupt act [of 1867 (14 Stat. 517)]; fourth, that in like manner he received various other sums to the assignee unknown; and, fifth, for various other reasons. As to his claim for six hundred and seventy-eight dollars and forty-three cents, the assignee alleges: First, that said note was taken up by money furnished by the bankrupt, and should be cancelled; and, second, that the note was given to pay premium of life insurance on the life of the said Joseph M. Schoenenberger, as well as on that of his father, and that ——— dollars thereof is due to the bankrupt's estate. The prayer of both petitions is that the claims be expunged or diminished. Both petitions were heard at the same time by the consent of the parties.

A thorough and complete examination of the claimant and of his father, the bankrupt, has been had, and the testimony of ten witnesses called by the parties has been taken and reduced to writing, which is filed herewith, together with the exhibit produced on the hearing; and the cause has been argued by Mr. L. Kramer, for the plaintiff, and Mr. J. H. Perkins, for the assignee. It was agreed by counsel that in considering the above-named claims of Joseph M. Schoenenberger, that his other claim for twenty-two dollars and forty-seven cents, also proved and filed, and the claim of his father, the bankrupt, as to his right to be paid five hundred dollars as an exemption in lieu of a homestead, should also be considered and passed upon by the court.

It was claimed in argument by counsel for the assignee: First, that it being shown by the evidence that the sum of one hundred and fifty dollars for one month's wages was erroneously included in the note of the bankrupt on file for nine thousand five hundred dollars, should be credited with the sum of twenty-two dollars and forty-seven cents, the amount of the claimant's third claim, and that the residue, amounting to one hundred and twenty-seven dollars and fifty-three cents, should be deducted from that note, which was not dissented to by Mr. Kramer, and it will be so ordered; second, that five thousand dollars was the money of the claimant's wife, and that the proof filed for eight thousand eight hundred and sixty-four dollars is not a bona fide claim; third, that the payment of two thousand dollars, received by the claimant on April 1, 1876, was a fraudulent preference, within the meaning of section 5128 of the Revised Statutes of the United States; fourth, that the note for six hundred and seventy-eight dollars and forty-three

cents purchased by the claimant from the Union Central Life Insurance Company became void after due, that it was given partly for a debt of the claimant; fifth, that the bankrupt is not entitled to the exemption of five hundred dollars in lieu of a homestead; and, sixth, that the claimant having received a fraudulent preference, his claim must be reduced one-half, as provided for by section 12 of the amendatory act of June 22, 1874 [18 Stat. 180]. The converse of all these propositions except the first was argued by Mr. Kramer, who appeared both for the claimant and the bankrupt.

The testimony shows the following dates, which have bearing more or less direct on the transaction had between the parties. The claimant was born November 9, 1847. The indorsement of the bankrupt to the German American Bank on the Skates note, for two thousand one hundred and sixteen dollars and twenty-two cents, became due March 22, 1876. The sum of two thousand dollars was paid by the bankrupt to claimant April 1, 1876. The deed of assignment by the bankrupt to Mr. Long was dated April 6, 1876. The voluntary petition of the bankrupt was filed in bankruptcy June 3, 1876. Also, that for a period of more than seven years prior to the filing of his petition, the bankrupt had been engaged as a merchant and trader in the city of Cincinnati, in the business of selling hardware and bar iron. That from 1869 to the date of the assignment to Mr. Long (with the exception of a short voyage to Europe), the claimant occupied the position of clerk to his father, and for the last four years he was the bookkeeper, and for the last two years of said period he received a salary of eighteen hundred dollars per year, besides house rent, the use of a horse and buggy, etc. That in October, 1869, the claimant received from his wife three thousand dollars in cash and invested it in a loan to his father, and that in February, 1870, he received from her the further sum of two thousand dollars which he also invested in a loan to his father. These sums Mrs. Schoenenberger received from the estate of her deceased father, Francis Schnebeien, late of Dahmm, in the province of Alsatia, France, in two payments in gold, one of fifteen thousand and the other of thirteen thousand francs. For the purposes of this case he reduced to his possession five thousand dollars of these funds and loaned them to his father, which, with accrued interest, formed part of the consideration of the note for nine thousand five hundred dollars, filed by the claimant with his proof of claim. The residue of the consideration was made up by his savings while acting as clerk or bookkeeper for his father. For the years 1874 and 1875 his salary amounted to three thousand six hundred dollars (or eighteen hundred dollars per year) besides perquisites, and it is possible that during a period of seven years he might have laid up with the accruing interest enough to

make up the balance of the consideration. It is true that for the last two years he enjoyed an enormous salary for the services rendered, but the testimony before me does not warrant me in impeaching the consideration of the note.

It is claimed by counsel for the assignee in bankruptcy that the payment of two thousand dollars, received by the claimant of his father on the 1st day of April, 1876, and indorsed as a credit on the note for nine thousand five hundred dollars, was a fraudulent preference within the meaning of section 5128 of the Revised Statutes. That section is as follows:

"Sec. 5128. If any person, being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, with a view to give a preference to any creditor or person having a claim against him, or who is under any liability for him, procures or suffers any part of his property to be attached, sequestered or seized on execution, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge, assignment, transfer or conveyance, or to be benefited thereby, or by such attachment, having reasonable cause to believe such person is insolvent, and that such attachment, payment, pledge, assignment or conveyance is made in fraud of the provisions of this title, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it, or so to be benefited."

By an act amendatory of said section, approved June 22, 1874, the foregoing section was amended, so far as it may relate to involuntary and compulsory bankruptcies, as follows:

"Sec. 10. That in cases of involuntary or compulsory bankruptcy, the period of four months mentioned in section 35 (section 5128), of the act to which this is an amendment, is hereby changed to two months; but this provision shall not take effect until two months after the passage of this act. And in the cases aforesaid, the period of six months mentioned in said section 35 is hereby changed to three months; but this provision shall not take effect until three months after the passage of this act.

"Sec. 11. That section 35 of said act be and the same is hereby amended as follows: First. After the word 'and' in line eleven, insert the word 'knowing.' Second. After the word 'attachment' in the same line, insert the words 'sequestration, seizure.' Third. After the word 'and' in line twenty, insert the word 'knowing'; and nothing in said section 35 shall be construed to invalidate any loan of actual value, or the security therefor, made in good faith, upon a security taken in good faith on the occasion of the making of such loan."

As the law now stands, the limitation within which a preference may be set aside is four months in cases of voluntary and two months in cases of compulsory bankruptcy; and the question arising in this case is, "Was the bankrupt insolvent on the 1st day of April, 1876? If yea, did his son, the claimant, have reasonable cause to believe him to be insolvent, and did he receive the money knowing it to be in fraud of the provisions of the bankrupt law?" The term "insolvency" has been defined by the supreme court of the United States (Toof v. Martin, 13 Wall. [80 U. S.] 40), to mean, in the case of a trader or merchant, an inability to pay his debts as they mature in the ordinary course of his business. What are the facts as established by the evidence?

Neave testifies that the books show that the bankrupt was in a failing condition, and had been for several years. The claimant, who was the bookkeeper, testifies that on January 1, 1876, when he balanced the books, "father was in debt to the concern thirteen thousand three hundred and sixty-six dollars and ten cents." He was then insolvent, and to keep up his credit was borrowing heavily from the banks with whom he dealt, and from every person who would lend him money or their paper. Again, the Skates note for two thousand one hundred and sixteen dollars and twenty-two cents, which the bankrupt had had discounted by the German American Bank, fell due March 22, 1876, and was not paid by Skates, nor was it paid by the bankrupt, who was its indorser, and has never been paid. To protect himself against the charge of insolvency, the bankrupt should have paid it the next day, but it was not paid then nor since. The bankrupt gave the bank a chattel-mortgage and a policy on the life of Skates as security, which it still holds. He testifies he made "no agreement with the bank to extend it. I thought it was going to be paid every day, and so I did not make any agreement." He had borrowed the money of the bank, and, so far as the bank was concerned, it was the commercial paper of the bankrupt as well as of Skates. Again, the fact of his father's insolvency and of the claimant's knowledge of it, is testified to by Mr. Neave, who states that "he (the claimant) acknowledged that for some years past he had been aware of his father's failing condition, but he still hoped that something would turn up and that he would get out of it, and that his father's assignment and failure had taken a great weight off of his mind." I deem it proper here to say that the claimant contradicts this statement of the witness Neave. Without reverting to any other of the facts and circumstances of the case established by the evidence, it is impossible for me to resist the conclusion that the claimant knew the insolvent condition of his father on the 1st day of April, 1876, and that he knew he was then obtaining an unlawful, and therefore fraudulent, preference when he received the sum of two thousand dollars which he has credited on his note.

In regard to the note for six hundred and seventy-eight dollars and forty-three cents assigned to the claimant by the Union Central Life Insurance Company, I find from the evidence that two hundred and twelve dollars of that amount was for premium on the life policy issued to the claimant, and that the residue was for premium on the policy issued to the bankrupt; that the claimant gave to his father two hundred and twelve dollars in money, which he kept and used, and settled with the company by giving his note for the whole, which note was afterwards taken up by the claimant and proved by him as a claim against his father's estate.

In regard to the exemption of five hundred dollars, allowed to the bankrupt in lieu of a homestead, I find that there is no testimony impeaching his right to receive the same from the assignee, and he will accordingly be directed to pay the same.

In regard to the right of the claimant to prove his whole debt, the following is the provision of the amendatory act of June 22, 1874:

"Sec. 12. Provided, that the person receiving such payment or conveyance had reasonable cause to believe that the debtor was insolvent, and knew that a fraud on this act was intended, and such person, if a creditor, shall not, in cases of actual fraud on his part, be allowed to prove for more than a moiety of his debt, and this limitation on the proof of debts shall apply to cases of voluntary as well as involuntary bankruptcy."

I have already found from the evidence that when he received the payment of two thousand dollars, the claimant had reasonable cause to believe that his father was insolvent, and knew that a fraud on this act was intended; the conclusion necessarily follows that he can be permitted to prove but a moiety of his debt. Having proved for the whole, the proof must be diminished so as to comply with the law. Unless he shall voluntarily return his preference to the assignee, his claim will stand as follows:

| | |
|---|---|
| Amount of note | $9,500 00 |
| Amount of his third claim | 22 47 |
| | |
| Total | $9,522 47 |
| Deduct for error | 150 00 |
| | |
| Total | $9,372 47 |

Of which a moiety is four thousand six hundred and eighty-six dollars and twenty-three and one-half cents, to which extent his claim will be diminished. The claim for six hundred and seventy-eight dollars and forty-three cents on the insurance note is valued for its face, and the petition for its re-examination will be dismissed. The claim of the bankrupt for five hundred dollars, as an exemption in lieu of a homestead, will be ordered paid by the assignee.

NOTE. On the 27th of February, 1877, and before the expiration of the time limited by general order 34, for forming an issue to be certified to the court for determination, the claimant filed a petition expressing his acquiescence in the foregoing opinion, and voluntarily offering to restore to the assignee the preference which he had received. Whereupon, there being no actual but only a constructive fraud, I directed the assignee to receive the same, with interest from April 1, 1876, and that the penalty imposed upon the claimant be remitted, and that he be allowed to share in common with the other general creditors in all dividends declared or to be declared. Flamen Ball, Register.